IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 4, 2012

**TERRANCE ROSE v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 07-04461      J. Robert Carter, Judge**

**No. W2012-00610-CCA-R3-PC  - Filed January 10, 2013**

The petitioner, Terrance Rose, appeals the denial of his petition for post-conviction relief, arguing that he received ineffective assistance of counsel due to counsel's failure to properly communicate with him and to prepare him to testify at trial. Following our review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER and JEFFREY S. BIVINS, JJ., joined.

Michael R. Working, Memphis, Tennessee, for the appellant, Terrance Rose.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Amy P. Weirich, District Attorney General; and Paul Goodman, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

In 2007, the Shelby County Grand Jury indicted the petitioner and a co-defendant, Charles Williams, for the first degree felony murder and especially aggravated robbery of the victim, Christopher Smith, who was found shot to death on a wooded walking trail in a Cordova neighborhood. Williams, who was tried first, was convicted of the indicted offenses and sentenced to an effective term of life plus fifteen years. See State v. Charles Williams, No. W2008-02211-CCA-R3-CD, 2010 WL 1930965, at *1 (Tenn. Crim. App. May 13, 2010), perm. app. denied (Tenn. Apr. 12, 2011).

Following his separate jury trial, the petitioner was convicted of the lesser included offense of reckless homicide, a Class D felony, and the indicted offense of especially aggravated robbery and sentenced to concurrent terms of three years and twenty years, respectively. The petitioner's convictions were affirmed by this court on direct appeal, and our supreme court denied the petitioner's application for permission to appeal. State v. Terance Rose, No. W2008-02214-CCA-R3-CD, 2010 WL 2219596, at *1 (Tenn. Crim. App. May 20, 2010), perm. app. denied (Tenn. Nov. 12, 2010).

The State's proof at trial established that the victim was shot and killed after the petitioner, using the alias "Markese," called sometime after 12:00 a.m on March 11, 2007, to arrange a meeting to purchase marijuana from the victim. Id. Williams accompanied the petitioner to the meeting place, and it was he who fired the fatal shot that resulted in the victim's death. The victim's body was found by a neighborhood resident who was walking his dog on the morning of March 11. Near the body was a compact disc case with a set of digital scales inside; a nine-millimeter handgun with its safety on and its chamber and magazine empty; the gun's magazine, which was lying several feet away from the gun; two fired .380 caliber bullets, and several empty .380 caliber shell casings. There were no drugs recovered from the victim or the crime scene. Id. at *2.

The petitioner, who was arrested later that same day, had ten grams of marijuana packaged in five small bags on his person. Id. at *2. He ultimately gave three different statements to police: two on March 11 and a third on March 13. Id. at *4. In the first statement, the petitioner claimed that the shooting had occurred in self-defense and said that he had thrown the murder weapon in a pond after fleeing the scene. Id. In the second statement, the petitioner said that the murder weapon was in the house in which he had been living, id., and a subsequent police search uncovered the gun hidden in attic insulation located adjacent to the petitioner's bedroom in the home. Id. at *3. In the third and final statement, the petitioner admitted that neither he nor Williams had enough money to finance the marijuana purchase and that the plan had been to rob the victim of his marijuana. All three of the petitioner's statements were published to the jury at trial. Id. at *4. The petitioner did not testify and did not present any witnesses in his defense. Id. at *6.

On November 14, 2011, the petitioner, with the assistance of counsel, filed a petition for post-conviction relief in which he raised a claim of ineffective assistance of counsel. Although he alleged a number of instances of ineffective assistance in his petition, he confines himself on appeal to arguing that counsel was deficient in his representation, thereby prejudicing the outcome of the petitioner's case, for failing to communicate with the petitioner and to prepare him to testify at trial.

At the evidentiary hearings, Charles Williams testified that his defense theory at his separate trial was that he was not present at the crime. He acknowledged, however, that he had given a statement in which he had admitted he was present and claimed that the victim's death resulted from a "drug deal that had gone bad." He said he never saw the petitioner in possession of a gun on the night of the victim's shooting and the petitioner was never part of any plan to rob the victim.

The petitioner's mother, Paula Mays, testified that she let the petitioner's court-appointed attorney know she was available to assist in locating witnesses and was willing to offer character evidence on behalf of her son at trial. She said she was not called to testify at trial, but she did testify at sentencing.

The petitioner's father, Burnest Rose, Jr., testified that he and trial counsel argued when he first met him because counsel, who appeared arrogant, accused the petitioner of being a member of a gang. After that initial meeting, counsel was never available when Rose called to speak with him and usually waited one to two weeks before returning Rose's phone calls. Rose stated that he offered to locate witnesses on the petitioner's behalf, but counsel never asked him to help find any witnesses. Counsel also never asked him to testify about the petitioner's good character at trial, although he offered to do so. Rose further testified that counsel failed to keep him involved in the petitioner's case and never informed him of what kind of defense strategy he intended to employ at trial.

The petitioner testified that trial counsel met with him for approximately three to five minutes each time he was brought from jail for a courtroom appearance in the months leading up to trial, which would have been about a dozen times, but that counsel never visited him in the jail. Trial counsel had only a five-minute conversation with him about whether he should testify, during which counsel recommended that he not take the stand. The petitioner said that he had almost no prior contact with the criminal justice system and followed counsel's advice because he did not know anything about the law. He stated that counsel never discussed the possibility of his testifying in order to explain his three different statements to the jury.

The petitioner further testified that he was never a part of his co-defendant's plan to rob the victim, had no weapon, and was simply inspecting the victim's marijuana when the victim and his co-defendant began shooting at each other. He said he consistently maintained throughout all three of his statements to police that he never planned to rob the victim and never shot him. He stated that he gave that same account of the crime to Anthony and Brandon Johnson and that his conversation with the Johnson brothers was overheard by Sheronda Burks, who testified at his trial. He informed counsel of his conversation with the Johnson brothers, but counsel, to his knowledge, never interviewed them.

-3-

On cross-examination, the petitioner acknowledged that he assured the trial court and his counsel at the time of trial that it was his decision not to testify in his own defense. He believed, however, that he would have received a more favorable result had he testified and if he had it to do over again, he would make a different decision. On redirect examination, the petitioner testified that he did not think he could have taken the stand at trial because counsel never prepared him to testify.

Trial counsel testified that he was licensed to practice law in both Tennessee and Arkansas and had been practicing law in Tennessee for approximately eleven years, with ninety-eight percent of his practice devoted to criminal defense. He estimated he had handled twenty to thirty homicide cases, including four or five capital murder cases, during that time.

Trial counsel testified that he advised the petitioner not to testify because of the three inconsistent statements he had given to police, which he thought would result in the petitioner's losing all credibility and sympathy with the jury if he testified and attempted to explain the statements. Without the petitioner's testimony, the jury was left with the petitioner's third statement, in which the petitioner, who was a young man with a minimal criminal record and a supportive family in attendance in the courtroom, admitted that the plan was to "take" the victim's marijuana but was vague enough in his details to make it appear that it was "a little bit more of a maybe we will, maybe we won't" type of situation rather than a concrete plan. Thus, although counsel thought that the jury had enough evidence to conclude that the petitioner was probably "up to no good," he believed that it might also find the petitioner less culpable and convict him of a lesser offense than felony murder, as it, in fact, ended up doing. Counsel explained:

> And in my experience, jury's [sic] just have a really hard time of looking at the guy who's not the shooter and he probably is not the one who planned this and convict him for a first degree. There's a disconnect. And you can ask jurors about it all day long in voir dire and they'll say yeah, I'm going to follow the law, but when it comes down to sentencing a young 19-year-old man, and they probably know it, to the rest of his life in jail, it's very difficult for them.
>
> And so there's always an issue in these kind of cases where there's very, very strong proof as to his guilt, . . . is then the question becomes can you unhook . . . the felony murder from the underlying felony?
>
> . . . .
>
> And just experience says a 19 year old kid who's not the shooter, who's

given a statement that he's a robber, you're going to get hit with something, but you're just hoping for the, you know, a lesser-included and something that's going to allow him to get out of jail sometime in the future.

Trial counsel testified that, in his opinion, the petitioner would have been convicted of felony murder had he testified at trial.

On cross-examination, trial counsel testified that the other individuals who were in the house with the petitioner and Charles Williams after they returned from the alleged murder and robbery were fellow gang members of Williams who were closely associated with Williams, whereas the petitioner was not. He could not remember what he did with those potential witnesses. He did, however, recall that he wanted to distance the petitioner from Williams and those other "Street Crips" gang members. Counsel testified that he did not interview the Johnson brothers. He said he knew that Brandon Johnson was currently in jail and, as he recalled, Anthony Johnson was in jail and represented by counsel at the time he prepared for the petitioner's trial. As for Sheronda Burks, he recalled that he had reviewed her statement and that he spoke to her in the hallway outside the courtroom before her testimony at trial. He also cross-examined her at trial. He could not, however, remember whether he ever spoke with her before the trial began.

Trial counsel later explained on redirect that each of the State's witnesses testified consistently with their pretrial statements to police, which counsel reviewed before trial. He said that none of the statements of those witnesses was necessarily inconsistent with his defense and that, had the witnesses' testimony differed from their statements, he was prepared to impeach them with the prior inconsistent statements.

Trial counsel testified that he would be surprised if he had not visited the petitioner in the jail but that he could not locate his billing sheet, had not pulled the jail log, and had no independent recollection of the number of visits he had with the petitioner. He was confident, however, that he met with the petitioner on every occasion when the petitioner was in court for the case to be reset, which would have occurred every thirty days. During those dozen or so visits, which he estimated lasted anywhere from five to thirty minutes, he would have asked the petitioner if anything new had come up or whether the petitioner had any questions for him about the case. Counsel testified that the bailiffs were always accommodating, especially in a murder case, and would not have prevented him from taking as much time with the petitioner as he felt necessary unless the meeting was occurring at the end of the court day. However, if that were the case, he would have visited the petitioner in jail to continue their conversation.

On March 21, 2012, the post-conviction court entered an order denying the petition for post-conviction relief on the basis that the petitioner failed to meet either the deficiency or the prejudice prong of the Strickland test for ineffective assistance of counsel. This appeal followed.

## ANALYSIS

On appeal, the petitioner argues that trial counsel provided ineffective assistance for failing to adequately meet with or communicate with him before trial and for failing to prepare him to testify in his own defense. The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). Moreover, the reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

The petitioner alleges that because he "did not receive a single jail visit or letter" from counsel, he was "largely uninformed about his case" and therefore unable to make an informed decision about testifying. He further alleges that counsel's failure to visit him in jail resulted in counsel's being "willingly uninformed of the materiality or availability of the State's witnesses at trial." The petitioner asserts that, "[g]iven the nature of the drastic difference in the verdicts" in his and his co-defendant's cases, "a reasonable probability exists" that the outcome of the case would have been different had he "been properly and fully informed of his rights by his attorney." The State disagrees, arguing that the post-conviction court properly denied the petition based on the petitioner's failure to show either a deficiency in counsel's performance or resulting prejudice to his case. We agree with the State.

Although trial counsel could not specifically recall whether he visited the petitioner in the jail, he was confident that he met with him at the back of the courtroom at every report date, which occurred once a month. Moreover, he was certain that the meetings lasted long enough for him to cover everything necessary and said that he would have continued the conversation in jail if any meeting was prematurely ended by the bailiffs. Counsel also offered a reasonable explanation for why he did not interview the Johnson brothers or other witnesses and why he advised the petitioner not to take the stand in his own defense. With respect to this latter point, the petitioner, himself, acknowledged in his voir dire before the trial court that his counsel had explained his right to testify in several meetings and that it was his decision not to take the stand in his own defense. The petitioner has not, therefore,

met his burden of showing that counsel was deficient in his general communication about the case or in his specific communication and advice to the petitioner about testifying.

The petitioner has also failed to meet his burden of showing that counsel's alleged failure to adequately communicate with him or advise him about his right to testify prejudiced the outcome of his case. In his brief, the petitioner asserts that the vastly different verdicts reached by the respective juries in his and Williams' cases show that there is a reasonable probability that the outcome of his case would have been different had counsel properly and fully informed him of his rights. We fail to follow the petitioner's logic. The petitioner has not presented any evidence to show that, had he testified at trial, he would have received a more favorable outcome at trial than the reckless homicide offense for which he was convicted. We conclude, therefore, that the petitioner has not met his burden of demonstrating that he received ineffective assistance of trial counsel.

## CONCLUSION

Based on our review, we conclude that the petitioner has failed to show either a deficiency in counsel's performance or resulting prejudice to this case. Accordingly, we affirm the denial of the petition for post-conviction relief.

_____
ALAN E. GLENN, JUDGE